IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARLENE JONES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 15-CV-07450 |
| J.B. HUNT TRANSPORT, INC., | ) ) Judge John J. Tharp, Jr. |
| Defendant. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darlene Jones alleges that she was fired from her job because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a). Her employer has moved for summary judgment on the ground that Jones has not provided evidence that her age was the cause of her firing. The Court agrees and grants summary judgment for the defendant.

**BACKGROUND**

On summary judgment, the Court construes all facts and draws all reasonable inferences in favor of Jones as the non-movant. *Roberts v. Columbia Coll. Chi.*, 821 F.3d 855, 861 (7th Cir. 2016). Plaintiff Darlene Jones, a resident of Chicago, Illinois, was born in 1947. Def.'s Statement of Facts ("DSOF") ¶ 1. Jones worked for defendant J.B. Hunt Transport, Inc. ("J.B. Hunt") from approximately 1988 until her 2015 termination. *See id.* at ¶¶ 3, 16.

J.B. Hunt is an international "containerized transport company" that moves commodities throughout North America. DSOF ¶ 10. Its industry is "both highly competitive and intensively time sensitive," making the timely delivery of cargo critical to its business. *Id.* at ¶ 11. The company employs a variety of individuals in a hierarchy to ensure that freight is loaded, unloaded, and transported in a timely fashion. *Id.* at ¶ 12.

Jones began working at J.B. Hunt in 1988 as a dispatcher and was promoted to Fleet Manager in approximately 1990. DSOF ¶ 16. Fleet Managers oversee "all aspects of the driver operation" for 22-32 drivers each and are responsible for ensuring that loads are timely delivered. *Id.* at ¶ 12-13. Fleet Managers are also responsible for receiving and sending messages to drivers and customers, identifying and solving potential impediments to prompt delivery, assuring driver compliance with government regulations, and identifying and rectifying safety issues. *Id.* at ¶ 12-15. One of the safety-related tasks Fleet Managers perform is to monitor "hard braking" events (that is, occasions when drivers are required to suddenly and forcefully apply the vehicle's brakes; these are tracked by equipment on the truck) and to counsel or discipline drivers who show an excessive number of hard brakes (which can indicate aggressive driving or close following and thus serve as risk indicators). *Id.* at ¶ 14.

The trouble began for Jones when she received a Corrective Action Notice on March 3, 2009 for failing to document safety events in a timely manner. DSOF ¶ 18. One month later, Jones's manager gave her a mixed performance review, noting that drivers had complained about waiting for messages and that the Fleet Manager position had "evolved from more of a dispatcher position to a true managerial position," causing Jones to struggle with multi-tasking and time management. *Id.* at ¶ 19. The manager stated in the evaluation that he believed Jones "would be better suited moving to another position within the office without as much responsibility."[1] *Id.* The evaluation also contained a few positive comments, such as that Jones got "along well with her drivers." *See* Ex. A Dep. Ex. 12 at 76-78. Jones responded to her performance review that she felt her manager "lack[ed] the managerial experience that allows

---

[1] Jones notes that the term "dispatcher" was not a job title at the time of her review (it had evolved into the Fleet Manager role) and that she believes the use of the term "dispatcher" may have been a reference to her age. Pl.'s Resp. to DSOF ("PSOF") ¶ 24.

2

him to conduct a fair and unbiased review," that the problem was just that certain "individuals do not work well together," and that "an employee is only as good as the leadership he or she receives." *Id.* at 78.

On July 10, 2009, manager Gary Lofgren issued an "Employee Challenge" which stated Jones must show improvement in multi-taking and improve the timeliness of her safety reports within 60 days. DSOF ¶ 21. The notice warned that "further performance issues will result in further disciplinary action up to and including termination." *Id*. An "employee challenge" is intended as a "learning tool" and Jones was deemed to have completed the challenge within the 60 days. Pl.'s Resp. to DSOF ("PSOF") ¶ 21. However, further "performance deficiencies" relating to scheduling failures were noted by her managers in November and December 2009. DSOF ¶ 23.

In January 2010, Director of Operations Don Ingersoll and Vice President of Operations Ken Miller decided to transfer Jones to the position of Driver Services Representative ("DSR") rather than terminate her for her continued performance issues. *Id*. at ¶ 24. Jones notes that she was told she was being transferred because the new position would be a better fit (and not explicitly that the transfer was a result of poor performance). PSOF ¶ 24. The new Fleet Manager was younger than Jones and had less experience. *Id*. J.B. Hunt asserts Miller transferred Jones because of her performance failures, not her age. DSOF ¶ 35.

Jones did not make a claim for age discrimination at the time, although she knew the procedure for making such a complaint and that J.B. Hunt had an anti-discrimination policy. DSOF ¶¶ 17, 32. Jones believed, however, that her transfer was based on age (rather than performance) because she had the most seniority in her department and was the oldest. She also felt that Ingersoll and a manger named "Sean" had a certain attitude, and that Ingersoll sent Sean

3

to stare at her after she became the DSR. *Id.* at ¶ 32. She described Ingersoll as "smiling, ignoring me, not getting back with answers and coming and sending Sean around to where I was working just to stare and grin and walk off." *Id.* at ¶ 33. She also testified that she felt Ingersoll acted like her transfer was a joke. *Id.* She could not think of any specific examples of Ingersoll displaying this attitude. *Id.* Jones further testified at her deposition that Sean (her immediate supervisor) would come to her office and make comments like "are you busy back here?" and "you don't get many phone calls back here?" DSOF ¶ 34. Jones "assumed" these were jokes and took them to be a comparison between the DSR and Fleet Manager positions. *Id.*

Jones's new job, as DSR, focused on ensuring that a "daily physical inventory" was taken of the yards at J.B. Hunt's Chicago facility to ensure their tracking system accurately showed which loads had been delivered and which were waiting. DSOF ¶ 25. The DSR's main job is to be the last line of defense against shipment tracking errors. *Id.* The DSR also had other miscellaneous duties, like passing out keys and maintaining courtesy cars (including logging the cars and keeping them fueled so they are always available). *Id.* at ¶ 26-27. There is only one DSR per facility, so the DSR's "attendance is also critical" to the functioning of each terminal. *Id.* at ¶ 28.

As a result of her transfer, Jones was no longer eligible for a bonus. DSOF ¶ 31. When she learned this, Jones questioned Human Resources, Ingersoll, and Miller. *Id.* Ingersoll said he would check and get back to her, the others confirmed her new position was not bonus eligible. *Id.* After learning this, Jones objected to being asked to do any duties she had done as Fleet Manager and told her manager (Rachel Christensen) that she expected to receive a bonus if those duties became a larger share of her time. *Id.* at ¶ 36. After she complained, however, she was not asked to do those tasks except in emergencies. *Id.* After the bonus issue, Jones alleges

4

Christensen made comments about her decision not to do Fleet Manager work, which Jones took to mean Christensen had taken the refusal personally. DSOF ¶ 37. Christensen says she did not take the issue personally, and that when they discussed bonus eligibility, it was because Jones would ask about it and Christensen would remind her that the DSR position was not bonus eligible. *Id*. at ¶ 38.

Jones also alleges that Christensen would occasionally make comments about her health or appearance, such as "you look tired," "are you feeling well?" and "are you up to the job?" DSOF ¶ 39. Jones does not recall the frequency of the comments or any specific context. *Id*. Christensen admits she made the comments when Jones appeared tired or sluggish because she was concerned for Jones's health and welfare. *Id*. at ¶ 40. Christensen stated she would make similar inquiries for any employee, regardless of age, because it is her job to make sure her employees are okay and "able to perform their jobs." *Id*.

In April 2013, Christensen provided Jones with her annual review, which flagged a number of deficiencies in communication, problem-solving, and record organization (although it was not entirely negative about other aspects of Jones's performance). DSOF ¶ 42. Christensen also criticized Jones's attendance, as she had five "call offs" (absences) in the first four months of 2013. *Id*. at ¶ 43. This began a series of attendance-related write ups by her managers in January 2014 and June 2014 along with fifteen absences or tardiness incidents in 2015. *Id.* at ¶¶ 45, 46, 50. Jones viewed these notices as "slightly petty" and "frivolous" although she acknowledges they are correct and that she did not know if she was being treated more harshly than anyone else. *Id*. at ¶ 47. Typically J.B. Hunt considered attendance problematic when an employee had four to five attendance problems in a rolling three month period; during 2014 and

5

2015, Jones's attendance was so spotty that there were eight such three-month periods. *Id.* at ¶¶ 44, 50.

Due to management turnover, Jones's 2013 review was not completed until September 2014. DSOF ¶ 52. Jones's manager explained that the yard check and shipment reconciliation were one of the "most important responsibilities" for her position. *Id*. Jones notes the review was quite late and states she felt the delay was "intentional and intimidating" (although her complaint did not mention this incident). PSOF ¶ 52.

In January 2015, J.B. Hunt learned that one of its major customers was waiting for a trailer that had been sitting in the Chicago yard for 30 days. This was the sort of error Jones was supposed to catch, but in this case did not detect. DSOF ¶ 53. In the wake of this incident, Jones received a "Final Written Corrective Action" of January 25, 2015 for failing to properly audit the Chicago yard and was told that a similar failure would result in termination. *Id*. Jones argued that the failure resulted from the actions of several employees and felt she was being made a "scapegoat." PSOF ¶ 54. She further declared that a yard employee was the one who told her whether trailers were empty or full (and thus the error was not her fault, as she was not required to physically open and inspect the trailers). Pl.'s Decl. ¶ 54, ECF No. 40.

Jones also complains that in January 2015, her manager harassed her by charging two of her absences against her vacation time. DSOF ¶ 62. When Jones brought the issue up with Human Resources, her manager was told to issue a corrective action rather than charge the absences to vacation time. *Id*. Jones was credited back her two days of vacation, paid for the days she was absent, and was not written up. *Id*.

6

In February 2015, Jones was written up[2] when a driver reported to manager Andrew Burkemper that the courtesy car (which Jones was required to keep fueled) had no gas. DSOF ¶ 55. The report came in on a Friday night after Jones had left work, but Burkemper personally confirmed the car had no fuel. *Id*. When Jones came in on Monday morning, she refueled the car and told her manager the car's tank had been partially full. *Id*. Her manager, who had also left work before the incident on Friday, trusted Burkemper's report and faulted Jones for failing to keep the car fueled. *Id*. Jones asserts it was unfair of her manager to trust Burkemper's word over hers and that he should have confirmed that (by Monday) the car was partially fueled. Pl.'s Decl. ¶ 60. Jones complained to Human Resources that this was "petty harassment" and Burkemper was lying, but she did not argue the incident was based on her age. DSOF ¶ 56.

On April 29, 2015, J.B. Hunt received an e-mail from one of its largest customers that threatened legal action as a result of J.B. Hunt's failure to deliver a trailer for five days or respond to their inquiries in a timely fashion. DSOF ¶ 65. Jones argued that she had done everything she was supposed to do, but Jones's managers decided the failure to properly track this trailer (which had been sitting in the yard) was Jones's responsibility and warranted termination in light of the earlier final corrective in January. *Id*. at ¶ 66. Jones argues her manages ignored that this error was also the cumulative result of several employee's failures. Pl.'s Decl. ¶ 66. On April 30, Jones contacted Human Resources to complain that "someone should have contacted claims and that her not sending a message would not have prevented [the error]," again arguing that other employees had played a role in the error. *Id*. at ¶ 67. Human Resources reviewed the incident and informed Jones the termination was valid. *Id*. Jones reiterated that she felt her supervisors were being unfair, but did not complain that she had been

---

[2] It is unclear from the record whether this was a formal written document or just a verbal correction.

discriminated against. *Id*. No age-related comments were made to Jones in the weeks leading up to her termination, but Jones believes her termination was a "continuation of age bias, harassment, hostility, just plain don't like you, all of it." *Id*. at ¶ 68-69. Jones was replaced by a female employee born in 1953. *Id*. at ¶ 71.

Jones did not know of anyone treated more favorably than her with regard to any of her complaints or anyone with the same performance issues who was not terminated. DSOF ¶ 75. J.B. Hunt introduced evidence that Jones's manager administered numerous attendance correctives to a younger Fleet Manager who did not have similar performance deficiencies and that the same manager terminated a younger employee (born in 1986) for a combination of attendance and unsatisfactory performance issues. *Id*. at ¶ 74.

Jones filed a charge of age discrimination regarding her termination and unspecified retaliation with the EEOC on May 26, 2015. DSOF ¶ 3. She received her Notice of Rights on June 1, 2015. *Id*. at ¶ 4. She filed this suit *pro se* on August 25, 2015. J.B. Hunt now moves for summary judgment.

## DISCUSSION

Jones argues she was subjected to age discrimination with regard to her transfer, Christensen's comments, "frivolous" written disciplinary warnings, the temporary loss of her vacation days, and her termination.[3] *See* Compl. "Summary judgment is appropriate when the

---

[3] Although her EEOC charge also contained an allegation of retaliation, her amended complaint does not mention retaliation. Furthermore, it is undisputed that Jones never made any sort of charge of age discrimination. *See* DSOF ¶ 77. Therefore, Jones did not engage in any protected activity (because she raised only general issues without any objection on the basis of age discrimination) that could give rise to a retaliation claim. *See Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012) ("In order for Smith's complaints to constitute protected activity, they must include an objection to discrimination on the basis of age."). Furthermore, the Court notes that other than her transfer and her termination, none of the actions alleged constitute an adverse employment action because they were not sufficiently serious. *See Crady v. Liberty*

pleadings and evidence in the record indicate the absence of any genuine issues of material fact, such that the moving party is entitled to judgment as a matter of law." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 657 (7th Cir. 2012). J.B. Hunt has moved for summary judgment on the ground that all of the actions challenged, other than Jones's termination, are untimely and there is no evidence age was the cause of her termination.

The ADEA requires that a plaintiff bring a charge of age discrimination within 300 days of the discriminatory action. *See* 29 U.S.C. § 626(d)(2); *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995). Thus, Jones's EEOC charge covers only the events taking place on or after July 30, 2014. Most importantly, this would exclude her 2010 transfer from Fleet Manager to DSR. Jones argues that the Court should apply the doctrine of equitable tolling because she did not realize her transfer might be a result of age discrimination. Equitable tolling allows a plaintiff to bring an otherwise time-barred claim when "despite all due diligence [she] is unable to obtain vital information bearing on the existence of [her] claim." *Jackson v. Rockford Hous. Auth.*, 213 F.3d 389, 396 (7th Cir. 2000). This is an objective inquiry that asks whether a reasonable person would have been aware of the possibility than an action was a result of illegal discrimination. *Id*. The Seventh Circuit in *Jackson* specifically gave the example of a replaced employee who met his younger replacement as a case where a person should have become aware of the possibility of age discrimination immediately. *Id*. Here, Jones worked in the same office and knew who had replaced her as Fleet Manager well before 2014. Thus, she should have

---

*Nat'l Bank & Tr. Co.*, 993 F.2d 132, 134-35 (7th Cir. 1993) (adverse employment action must be "material"); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action"). Christensen's occasionally queries as to her welfare, the disciplinary warnings, and the temporary loss of her vacation days do not rise to the level of materiality required to be considered adverse employment actions.

9

realized that she had a possible age discrimination claim and pursued it at that time. Her failure to do so bars her claims about conduct from before July 30, 2014.

The Court thus comes to the heart of J.B. Hunt's motion – the requirement that "an employee must show that age actually motivated the adverse employment action." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). In this case, a reasonable juror could not conclude that Jones's age motivated her termination. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (governing question is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action"). Jones has no direct evidence that her termination was a result of age discrimination. No age-related comments were made near the time of her termination. The only remarks that could conceivably (which is not to say reasonably) be construed as age-related (Christensen's health comments and perhaps Miller's comment that the Fleet Manager role had evolved from a dispatcher one) were also not related to the incidents for which she was terminated or the termination itself. *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993) ("Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge"); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (inference of discrimination appropriate only if remark was made "around the time of the decision" and "in reference to the adverse employment action").

Here, the evidence demonstrates that Jones was not meeting her employer's legitimate employment expectations and that is why she was fired. She was frequently late or absent and failed to catch at least two key shipment errors – the focus of her position – within a four month period. Jones does not dispute the record of these absences and errors. Rather, she suggests the

10

shipment errors were not exclusively her fault. That belief, however, is not sufficient to suggest that her performance was satisfactory. *See Silverman v. Bd. of Educ.*, 637 F.3d 729, 738 (7th Cir. 2011). Furthermore, Jones has not pointed to any younger employees who were treated more favorably, while J.B. Hunt has pointed to several that were similarly disciplined or terminated. In fact, Jones's replacement was a woman who was 62 years old (born in 1953), *see* DSOF ¶ 71, who would also be covered by the ADEA (further suggesting the reason for firing Jones was not to hire a substantially younger person).[4] At most, Jones has alleged that J.B. Hunt overreacted to her role in the errors, but she has produced no evidence that anyone was trying to get rid of her due to her age. *See EEOC v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (summary judgment appropriate where "evidence shows only that the employer made a wrong assessment").

Jones's termination was precipitated by several long-running performance issues and two deeply problematic failures within four months. Rather than demonstrating discriminatory animus, the record shows progressive discipline and an employer who bypassed several opportunities to fire Jones and chose instead to try and work with her to improve her performance until her failures precipitated major problems with clients of the company. Having failed to create an evidentiary dispute as to whether her termination was based on her age, Jones's case fails and summary judgment must be granted for her employer.

\*   \*   \*

For the reasons stated above, J.B. Hunt's motion for summary judgment is granted.

---

[4] It is also worth noting that Jones was 41 years old when first hired by J.B. Hunt, an age at which she was already in the class of employees protected by the ADEA.

11

Dated: July 24, 2017

John J. Tharp, Jr.
United States District Judge